IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| SUSAN J. HYLTON, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:13cv00067 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By:     Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Susan J. Hylton asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–422, 1381–1383f. This Court has authority to decide Hylton's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence and should be affirmed.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5)

whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Hylton protectively filed for DIB and SSI on February 10, 2011. *See* Administrative Record ("R.") 60, 69. She was 49 years old, *id.*, and had worked most recently as a nanny, R. 211. Hylton alleged disability beginning February 18, 2010, due to arthritis and osteoporosis, removal of an extra rib, bulging discs, bone spurs, irritable bowel syndrome, and high cholesterol.[1] R. 193, 196. The state agency twice denied her applications. R. 78–79, 102–03.

Hylton appeared with counsel at a hearing before Administrative Law Judge Drew Swank ("the ALJ" or "ALJ Swank") on July 25, 2012. *See* R. 9, 25–43. She testified as to many of her alleged impairments and the limitations those impairments caused in her daily activities. *See* R. 35–42. No one else testified at Hylton's hearing.

ALJ Swank denied Hylton's applications in a written decision dated August 13, 2012. *See* R. 9–20. He found that she suffered from four "severe impairments: osteopenia; degenerative disc disease of the cervical and lumbar spines; osteoarthritis of the left hip, knee, and foot; and

---

[1] Hylton previously filed for DIB on March 19, 2007, alleging disability from some of the same conditions. *See* R. 47, 49–50. In a written decision dated February 17, 2010, Administrative Law Judge Brian Kilbane ("ALJ Kilbane") concluded that Hylton was not disabled because she could return to her past relevant work as a nanny, retail manager, or store clerk as those jobs were actually and generally performed. R. 55. Hylton filed her current applications without asking a federal district court to review the Commissioner's final decision denying her first DIB claim.

3

left-sided neurogenic thoracic outlet syndrome."[2] R. 11–12. None of Hylton's severe impairments met or equaled an impairment listed in the Act's regulations. R. 14.

ALJ Swank next determined that Hylton had the residual functional capacity ("RFC") to perform a limited range of light work.[3] R. 14, 16. Specifically, he found that Hylton could perform light work as defined in the regulations, but could not perform "repetitive gripping, grasping, pushing, pulling, or overhead work with the left upper extremity"; could occasionally climb and kneel, but never crawl; and must avoid heights and hazards. R. 15. Finally, ALJ Swank concluded that Hylton was not disabled because she could return to her past relevant work as a nanny, retail manager, or store clerk as those jobs were actually and generally performed. R. 19. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

### III. Facts

A.    *Previous Factual Findings*

On February 17, 2010, ALJ Kilbane found that Hylton suffered from three "severe impairments: osteopenia; arthritis of the hands and knees; [and] left upper extremity peripheral

---

[2] "Thoracic outlet syndrome is a group of disorders that occur when the blood vessels or nerves in the space between [the] collarbone and [the] first rib (thoracic outlet) become compressed." Mayo Clinic, *Thoracic Outlet Syndrome*, http://www.mayoclinic.org/diseases-conditions/thoracic-outlet-syndrome/basics/definition/con-20040509 (rev. Aug. 1, 2013). Common symptoms of neurogenic (neurological) thoracic outlet syndrome include shoulder pain, neck pain, a weak grip, and numbness in the upper extremities. *See id.*

[3] "RFC" is a claimant's maximum ability to work "on a regular and continuing basis" despite his or her impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the claimant's record and must reflect the "total limiting effects" of the claimant's impairments. 20 C.F.R. §§ 404.1545, 416.945.

"Light work" involves lifting no more than twenty pounds at a time, but frequently lifting or carrying objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can lift twenty pounds (and frequently lift or carry ten pounds) can perform light work only if he or she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

neuropathy." R. 49. He determined that she could perform light work as defined in the regulations, but could not perform "repetitive gripping, grasping, pushing, pulling, or overhead work with the left upper extremity"; could occasionally climb and kneel, but never crawl; and must avoid heights and hazards. R. 50.

ALJ Kilbane also found that Hylton had past relevant work as a furniture factory utility person, retail manager, nanny, shipping worker, textile mill inspector, weaver, and store clerk. R. 55. He noted that the vocational expert, who testified at Hylton's hearing, classified each of these jobs as "light" work and testified that the RFC "defined above" allowed Hylton to "perform her past work as a retail manager, nanny, and store clerk."[4] *Id.* ALJ Kilbane concluded that Hylton was not disabled because she could perform these jobs as actually and generally performed. *Id.*

B.    *Current Medical Evidence*

1.    *Treatment Notes*

Hylton established care with Nurse Tracy Lange, F.N.P., at Bassett Family Practice on August 24, 2010. R. 293. She reported limited range of motion and "sharp, shooting" pain in her lower back that was worse when standing or moving. *See* R. 293–94. Hylton also explained that her left arm felt like "dead weight" when lifted above the shoulder for more than one minute. R. 293. On exam, Nurse Lange observed, relevant to these complaints, only that Hylton's trapezius muscle was tender. R. 295. She prescribed Meloxicam[5] for osteoarthritis pain and encouraged Hylton to exercise as tolerated. *Id.* Hylton returned on September 22, 2010, reporting the same symptoms. *See* R. 297. On exam, Nurse Lange noted "some muscle spasm" and "tenderness" to

---

[4] The administrative record filed with this Court does not contain a transcript or other evidence from ALJ Kilbane's hearing.

[5] Meloxicam (Mobic) is a nonsteroidal anti-inflammatory drug ("NSAID") used to relieve joint pain, tenderness, swelling, and stiffness caused by arthritis. *See* Mayo Clinic, *Meloxicam*, http://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (rev. Dec. 1, 2014).

palpation along Hylton's back. R. 298. She prescribed Lidoderm patches in addition to Meloxicam and instructed her to follow up in two weeks. *See* R. 298–99.

On October 7, 2010, Hylton told Nurse Lange that Lidoderm helped her "shoulder discomfort" to some extent. R. 300. On exam, Nurse Lange noted some muscle spasm and tenderness along Hylton's spine. R. 301. She increased Hylton's Meloxicam and instructed her to follow up in four weeks. *See id.* Hylton returned as scheduled on November 4, 2010, reporting the same symptoms as before, and Nurse Lange again found muscle spasms and tenderness on the spine. R. 302–03. Nurse Lange also observed that Hylton's gait was normal and she had full strength in all four extremities. R. 303. She prescribed Parafon Forte, a thrice-daily muscle relaxant, and instructed Hylton to follow up in four weeks. R. 303–04. Nurse Lange documented similar symptoms and objective findings during Hylton's next visit on December 2, 2010. *See* R. 305–06. She instructed Hylton to take Parafon only once each day. *See* R. 306.

Hylton next saw Nurse Lange on February 3, 2011. She said that she was trying to take Parafon twice a day because it "seem[ed] to help with pain." R. 308. On exam, Nurse Lange documented negative bilateral straight-leg tests, full strength in both lower extremities and the right upper extremity, and slightly decreased (4/5) strength in the left upper extremity. R. 309. She switched Hylton's Meloxicam to Diclofenac[6] "to see if she can get some better pain control." R. 309. Nurse Lange documented the same symptoms and objective findings during Hylton's next visit on March 16, 2011. *See* R. 311–12. She instructed Hylton to discontinue Lidoderm and continue Parafon and Diclofenac as prescribed. R. 312–13. Hylton did not report any musculoskeletal symptoms when she saw Nurse Lange on April 26, 2011. *See* R. 314.

---

[6] Diclofenac is a NSAID used to treat "mild-to-moderate pain" and arthritis symptoms such as inflammation, swelling, stiffness, and joint pain. Mayo Clinic, *Diclofenac*, http://www.mayoclinic.org/drugs-supplements/diclofenac-oral-route/description/drg-20069748 (rev. Dec. 1, 2014).

6

However, she told Nurse Lange that she "stayed on" the Meloxicam after her last visit because "the diclofenac was too high." R. 315. On exam, Nurse Lange noted that Hylton's gait was normal. R. 314. She switched Hylton back to Meloxicam and instructed her to continue Parafon. *See* R. 315.

Hylton returned to Bassett Family Practice on June 30, 2011, and July 20, 2011, complaining of pain "all over." *See* R. 328–30, 331–32. Nurse Melissa Smith, F.N.P., observed that Hylton's gait was normal on both visits. *See* R. 329, 332. On July 20, Nurse Smith referred Hylton to an orthopedic surgeon to evaluate her shoulder, back, hip, and leg pain. *See* R. 332. She also instructed Hylton to restart Meloxicam, which Hylton "ha[d] not been taking . . . due to finances." *Id.*

Hylton saw Dr. Robert Cassidy, M.D., at Rocky Mount Orthopedics on August 2, 2011. R. 324–26. She reported numbness and tingling in her forearms and pain in her neck, lower back, and knees that was unabated by medication. R. 324. On exam, Dr. Cassidy observed "limited motion by about 50% globally in the neck and lower back secondary to pain, but no muscle spasm." *Id.* Hylton's grip was weaker on the left than on the right, but there were no signs of atrophy, impaired sensation, or joint swelling in any of her extremities. *Id.* Dr. Cassidy instructed Hylton to continue her medications, enroll in physical therapy, and return in one month. R. 325–26. On December 29, 2011, Dr. Marrieth Rubio, M.D., observed that Hylton's gait, range of motion, and muscle tone were normal on exam. R. 372. There are no treatment notes dated between December 30, 2011, and August 13, 2012. *See* R. 24.

2.     *Medical-Source Opinions of Hylton's Functional Abilities*

On May 31, 2011, state-agency medical consultant Robert Keeley reviewed Hylton's medical records available through May 6, 2011. *See* R. 60–68, 69–77. He opined that Hylton had

7

multiple impairments that would restrict her ability to work, but that it was reasonable to expect that Hylton could perform "a range of light work with non-exertional" restrictions. R. 63. Specifically, Keeley found that Hylton could frequently lift and carry ten pounds; occasionally lift and carry twenty pounds; sit, stand, and walk for about six hours in an eight-hour workday; occasionally push, pull, and reach in any direction with her left arm; occasionally climb stairs and ramps, balance, stoop, kneel, and crouch; and never crawl or climb ladders, ropes, or scaffolds. *See* R. 65. He also opined that Hylton should avoid concentrated exposure to hazards. *Id.* Keeley attributed these restrictions to Hylton's osteopenia, degenerative disc disease, osteoarthritis, and left-sided cervical rib resection. *See* R. 63–65.

State-agency physician Dr. Joseph Duckwall, M.D., reconsidered Hylton's applications on October 25, 2011. *See* R. 80–90, 91–101. He agreed with Keeley's RFC assessment in every material respect. *Compare* R. 87, *with* R. 65. Dr. Duckwall opined that Hylton's back and joint pain did not "completely limit" her ability to stand, walk, and move about during a normal workday. R. 90. He also explained that Hylton could bend and stoop occasionally because her medical records revealed "no severe loss of muscle tone or strength." *Id.*

Nurse Lange completed two medical-source statements on July 12, 2012. R. 388–89, 390–94. Relying on year-old treatment notes, Nurse Lange opined that Hylton (1) could never lift ten or more pounds; (2) could never twist, stoop, crouch, or climb stairs; (3) could sit, stand, and walk for thirty minutes at a time, up to two hours a day; (4) must be able to sit and stand at will; (5) must get up and walk for five minutes every half hour; (6) must "avoid even moderate exposure" to numerous environmental irritants; and (7) would often require unscheduled breaks. *See* R. 388–94.

Nurse Lange gave conflicting opinions about Hylton's ability to use her arms and hands. *Compare* R. 389, *with* R. 393. On one form, she said that Hylton's osteoarthritis did not affect her ability to reach, push, pull, handle, or manipulate objects. R. 389. On the other, she said that Hylton had "significant limitations with reaching, handling, or fingering," and estimated that Hylton could use her arms, hands, and fingers for ten percent—or about 48 minutes—of an eight-hour workday. R. 393. Nurse Lange did not explain this conflict.

C.      *Hylton's Statements*

On May 4, 2011, Hylton's attorney filled out a Pain Questionnaire and Adult Function Report on her behalf. *See* R. 203–10, 227–29. She reported experiencing constant "aching, burning, and throbbing pain" in her back, knees, ankles, and hip, as well as pain in her neck and numbness in her arm. *See* R. 204, 227. On a typical day, Hylton woke up, took a bath, watched television, prepared simple meals, did the dishes and laundry, vacuumed, swept, drove herself places, and sometimes fed her sister's dogs and chickens. *See* R. 204–05. She needed help mowing the yard and changing light bulbs. *See* R. 229. Hylton reported no problems tending to her personal needs other than needing extra time to do her hair "because of the numbness in [her] arms." R. 204.

Hylton reported that pain affected her ability to sit, stand, walk, lift, climb, squat, kneel, and use her left hand. *See* R. 208. She estimated that she could sit and stand for up to forty-five minutes; walk one block; and lift or carry fifteen pounds. R. 208, 229. Hylton denied trouble reaching. R. 208. In July 2012, Hylton testified that she could sit and stand for up to an hour, walk for fifteen minutes, and lift or carry up to ten pounds. *See* R. 35–36. She denied difficulty tending to her personal needs and did not report trouble using either upper extremity. *See* R. 38, 35–42.

9

IV. Discussion

Hylton's overarching argument is that substantial evidence does not support ALJ Swank's RFC determination. *See generally* Pl. Br. 13–19, 21–22, ECF No. 17. She argues that he erred in evaluating opinions from Nurse Lange and the two state-agency reviewers, as well as her own credibility. *See id.* at 15–17, 19, 21–22. Hylton also argues that ALJ Swank should have called a vocational expert ("VE") to testify about her ability to work because ALJ Swank found severe medical impairments that ALJ Kilbane did not. *Id.* at 19–21.

A.    *Medical-Source Opinions*

ALJs must weigh each "medical opinion" in the applicant's record. 20 C.F.R. §§ 404.1527(c), 416.927(c). Medical opinions are statements from "acceptable medical sources," such as physicians, that reflect judgments about the nature and severity of the claimant's impairment, including her symptoms, diagnosis and prognosis, functional limitations, and remaining capabilities. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical reviewers. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Opinions from non-treating sources are not entitled to any particular weight.[7] *See id.* Rather, the ALJ must consider certain factors in determining what weight to give such opinions, including the source's familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other evidence in the record. *See id.* The ALJ must

---

[7] A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence" in the record. *Mastro v. Apfel*, 270 F.3d 171,178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). There are no treating-source medical opinions regarding Hylton's impairments in the record.

10

explain the weight given to all medical opinions and the reasons for that weight. *See Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013); 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). If the ALJ's RFC assessment conflicts with a medical opinion, he also must explain why that opinion was not adopted in full. *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996)).

Non-acceptable medical sources, such as nurses, cannot give "medical opinions" about the claimant's condition. *See* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). But they can provide valuable information about the claimant's medical condition and functional limitations. *See Adkins v. Colvin*, No. 4:13cv24, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014) (Kiser, J.). The ALJ may consider their opinions as he would opinions from acceptable medical sources, and he should do so when the source "had a lengthy relationship" with the claimant. *Id.* at *3 n.6. But non-acceptable medical sources are not "treating" sources, and their opinions are never entitled to any particular weight. *See id.* at *3; 20 C.F.R. §§ 404.1527, 416.927.

1.    *The ALJ's Findings*

ALJ Swank considered the opinions of Nurse Lange and the state-agency reviewers in forming Hylton's RFC. R. 18–19. He gave "some weight" to the state-agency reviewers' opinions because he found them to be "generally consistent with the other evidence in the record" as of August 2012. R. 18. ALJ Swank accepted the reviewers' opinions that Hylton could perform light work that never required crawling and only occasionally required climbing or kneeling. *See* R. 15, 18, 74–75, 86–88. He rejected their opinions that Hylton should also be limited to occasional stooping and crouching because Hylton's physical exams did not support further restricting her "postural maneuvers." *See* R. 18. ALJ Swank's RFC also does not

11

incorporate the restriction to "occasional" left-sided lateral reaching, which the reviewers attributed to Hylton's cervical rib resection. *See* R. 15, 74–75, 86–87.

ALJ Swank did not say what weight he gave to Nurse Lange's opinions. *See* R. 19. Rather, he listed several reasons why those opinions were "not provided controlling weight." *Id.* He explained that Nurse Lange was not an acceptable medical source and that her work-preclusive restrictions were "inconsistent with the other evidence in the record," including generally unremarkable diagnostic studies and physical examinations, Hylton's routine and conservative treatment, and Hylton's self-reported daily activities. R. 19.

  2.  *Analysis*

Hylton argues that ALJ Swank's RFC is fatally flawed because he did not expressly weigh the state-agency reviewers' opinions that Hylton could only occasionally reach in front and to the side with her left arm. Pl. Br. 18–19. I disagree. ALJ Swank summarized the reviewers' opinions, recognized that they did not personally examine Hylton, considered the weight of the evidence supporting their opinions, and compared their opinions to other evidence in the record. R. 18; *see* 20 C.F.R. §§ 404.1527(c), 416.927(c) (listing the factors ALJs must consider when weighing medical opinions). His decision also made clear that he gave the opinions "some weight" because they were "generally," but not entirely, consistent with other evidence in the full record. R. 18; *see Radford*, 734 F.3d at 295–96 (explaining that ALJs must adequately explain the weight given to all medical opinions and the reasons for that weight). The ALJ need not provide "a point-by-point articulation of each inconsistency" between a medical opinion and the record to survive judicial review. *Thompson v. Colvin*, No. 7:13cv32, 2014 WL 4792956, at *3 (W.D. Va. Sept. 25, 2014) (quoting *Hawley v. Colvin*, No. 5:12cv260-FL, 2013 WL 6184954, at *4 (E.D.N.C. Nov. 25, 2013)).

ALJ Swank's finding that Hylton "cannot perform repetitive . . . pushing, pulling, or overhead work with the left upper extremity," R. 15, mirrors the reviewers' opinions that Hylton can only occasionally push, pull, and reach forward or overhead with that arm, R. 74–75, 86–87. Although ALJ Swank did not explain his disagreement with the lateral-reaching restriction, R. 18, he did address Hylton's cervical rib resection and "history of problems with her non-dominant left-upper extremity," R. 16, which the state-agency reviewers cited as the reason for limiting Hylton to occasional lateral reaching, *see* R. 74–75, 86–87.

ALJ Swank found that Hylton's medical records documented diminished left grip strength—and no other abnormalities—on only a few occasions after February 18, 2010. R. 16. This finding is supported by Nurse Lange's, Dr. Cassidy's, and Dr. Rubio's findings on physical exams throughout the relevant period. *See* R. 303, 305–06, 309 (full grip strength); R. 309, 311–12, 324 (diminished left grip strength); R. 324 (no muscle atrophy, joint swelling, or impaired sensation); R. 371–72 (normal range of motion and muscle tone); *see also* R. 294–95, 297–98, 300–01 (no relevant findings). ALJ Swank also considered Nurse Lange's RFC assessments, neither of which restricted lateral reaching. R. 19, 389, 393. This examining-source evidence fully supports ALJ Swank's decision to reject the state-agency reviewers' contrary opinions. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1).

Hylton also argues that the ALJ should have given greater weight to Nurse Lange's opinions because she "treated [Hylton] for almost two years . . . and her opinions are consistent with and supported by the other evidence [in the] record." Pl. Br. 17. These arguments are without merit. First, Nurse Lange is not a treating source, and her opinions are not entitled to any particular weight. *Adkins*, 2014 WL 3734331, at *3. There is also an eleven-month gap between Nurse Lange's final clinic note, dated July 20, 2011, and her RFC assessments, dated July 12,

2012. R. 332, 389, 394; *cf. Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (finding "no error in the ALJ's consideration of the year delay" between a treating physician's last examination and "opinion of disability," even though both occurred during the relevant period).

Second, ALJ Swank explained that Nurse Lange's restrictions were "inconsistent with the other evidence in the record," including generally unremarkable diagnostic studies and physical examinations, Hylton's routine and conservative treatment, and Hylton's self-reported daily activities. R. 19. These are legitimate reasons to reject even a treating physician's opinion if they are supported by the record. *See, e.g.*, *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam) (substantial evidence supported ALJ's decision to reject treating physician's opinion "in its entirety" where the opinion was "inconsistent with the mild to moderate diagnostic findings, the conservative nature of Bishop's treatment, and the generally normal findings during physical examinations"); *Chestnut v. Colvin*, No. 4:13cv8, 2014 WL 2967914, at *4 (W.D. Va. June 30, 2014) (Kiser, J.) ("[T]he ALJ may properly discount the opinion of a treating physician when it is inconsistent with a claimant's daily activities.").

The record fully supports ALJ Swank's critique of Nurse Lange's opinions. Nurse Lange opined that Hylton can lift at most ten pounds; sit, stand, and walk for thirty minutes at a time, up to two hours a day; use her arms and hands for ten percent of an eight-hour day; and never twist, bend, crouch, or climb stairs. *See* R. 388–89, 392–93. She also noted that Hylton exhibited an abnormal gait, positive straight-leg raising tests, sensory and reflex loss, and muscle atrophy and weakness even before her first visit to Bassett Family Practice on August 24, 2010. *See* R. 391, 394. Nurse Lange simply wrote "see attached records" when asked to explain why she checked off these restrictions and objective findings. *See* R. 388–89.

14

Hylton's Bassett Family Practice records do not support such severe functional limitations or Nurse Lange's recollection of her objective findings. Treatment notes dated between August 24, 2010, and October 7, 2010, document some muscle spasms and tenderness to palpation of the trapezius and paraspinal muscles. R. 295, 298, 301. Notes dated November 4, 2010, through July 20, 2011, show that Hylton had a normal gait, intact sensation and reflexes, negative straight-leg tests, full strength in both lower extremities, full strength in her right upper extremity, and full or slightly decreased strength in her left upper extremity. R. 303, 305–06, 309, 311–12, 314, 329, 332. Nurse Lange never questioned Hylton's functional capability during this time. On the contrary, she encouraged Hylton to exercise "as tolerate[d]" even when Hylton reported chronic joint pain and weakness. *See* R. 295, 298, 301. ALJ Swank reasonably rejected the functional restrictions imposed by Nurse Lange that conflicted with her own notes. *Cf. Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (substantial evidence supported ALJ's decision to reject treating physician's conclusory opinion where the opinion was not supported by the physician's own treatment notes).

ALJ Swank also cited Hylton's routine and conservative treatment as a reason to question Nurse Lange's opinions. R. 19. While there is "no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment," *Gill v. Astrue*, No. 3:11cv85, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012), an unexplained inconsistency between a practitioner's characterization of her patient's condition and the treatment she prescribes for that condition can weigh against the practitioner's opinion, *Bishop*, 583 F. App'x at 67. Nurse Lange prescribed non-narcotic pain medication, muscle relaxants, heat, and exercise to manage Hylton's pain. *See* R. 295, 298–99, 301, 303–04, 306, 309, 312–13, 315, 332. She adjusted Hylton's medications when Hylton reported a positive response, but never recommended updated diagnostic studies or more

15

aggressive treatment.[8] *See, e.g.*, R. 298–99, 301, 303–04, 306, 309, 315, 332. Nurse Lange referred Hylton to Dr. Cassidy, an orthopedic surgeon, almost a year after she first reported chronic joint pain and weakness. *See* R. 293, 332. Dr. Cassidy instructed Hylton to continue taking non-narcotic medication, enroll in physical therapy, and return in one month. R. 325–26. Hylton did not return to Dr. Cassidy's clinic, and she apparently sought no healthcare at all for several months before Nurse Lange issued her opinions. *See* R. 24. This evidence supports ALJ Swank's finding that Hylton's treatment history undermines Nurse Lange's opinion that Hylton suffered from chronic debilitating osteoarthritis.

ALJ Swank also found that Nurse Lange's restrictions conflicted with Hylton's ability to perform "light exertion[]" daily activities. R. 19. Earlier in his decision, ALJ Swank summarized Hylton's statements that she cared for herself, occasionally helped feed her sister's dogs and chickens, prepared simple meals every day, performed household chores including laundry, vacuuming, and washing dishes unassisted, drove herself places, went grocery shopping, read, and watched television. R. 17; *see also* R. 203–10, 227–29. The ALJ may discount even a treating physician's opinion of the claimant's functional limitations when that opinion is inconsistent with the claimant's daily activities. *Chestnut*, 2014 WL 2967914, at *4. In this case, ALJ Swank reasonably concluded that Hylton's self-reported daily activities were inconsistent with Nurse Lange's opinion of her limitations. *Cf. Doll-Carpenter v. Comm'r of Soc. Sec.*, No.

---

[8] Diagnostic images dated June and July 2009 show some degenerative changes in the left knee, R. 271, mild degenerative changes in the left foot, R. 275, minimal disc bulging and minimal facet arthropathy at L3-4 and L4-5, R. 277, and osteopenia (but not osteoarthritis) in the lumbar spine and hip, R. 281. On October 7, 2010, Nurse Lange noted that the clinic would order an MRI before Hylton's upcoming neurology appointment. R. 301. On November 4, 2010, Hylton told Nurse Lange that Dr. Elias, presumably the neurologist, recommended physical therapy for her "back issues." R. 302. The updated MRI results and Dr. Elias's treatment notes are not in the record. Nurse Lange later noted that Hylton had not attended physical therapy because she did not "have a way to get [there]." R. 305, 308.

16

4:11cv28, 2012 WL 5464956, at *6–7 (W.D. Va. May 7, 2012) (Kiser, J.) (physician's opinion that the claimant "could not perform the exertional requirements of light work" was reasonably inconsistent with claimant's testimony that she could "care for pets, go to the grocery store once to twice per week, prepare meals two to three times per week, clean her house for several hours, do laundry once per week, read, [and] lift ten to fifteen pounds").

Hylton also argues that certain diagnostic images "clearly revealed disabling findings" in 2009, and corroborate Nurse Lange's opinions from 2012. Pl. Br. 15, 17. She does not explain how evidence of mild and minimal degenerative changes—which were also in the record before ALJ Kilbane—corroborate Nurse Lange's work-preclusive restrictions. *See* R. 51–54, 271, 275, 277, 281. She simply disagrees with ALJ Swank's choice between conflicting medical evidence. This Court cannot second-guess that choice were the ALJ gave specific and legitimate reasons, supported by substantial evidence in the record, for discrediting a medical source's opinion. *Bishop*, 583 F. App'x at 67. Given the persuasive evidence discussed above, I find no error with ALJ Swank's decision to reject Nurse Lange's opinions. *Cf. Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *3–4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) ("Plaintiff's medical records conflict with Dr. Trost's opinions, and thus it was the ALJ's role to weigh the evidence to determine which evidence was more persuasive. Unfortunately for Plaintiff, the ALJ sided— fairly and consistently with the law—against Dr. Trost.").

The evidence that supports ALJ Swank's opinion analysis also sustains his RFC determination. ALJ Swank restricted Hylton's ability to sit, stand, walk, lift, reach, climb, kneel, and crawl such that she can perform a limited range of light work. R. 14–15, 16. A person who can lift twenty pounds (and frequently lift and carry ten pounds) can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or

17

4:11cv28, 2012 WL 5464956, at *6–7 (W.D. Va. May 7, 2012) (Kiser, J.) (physician's opinion that the claimant "could not perform the exertional requirements of light work" was reasonably inconsistent with claimant's testimony that she could "care for pets, go to the grocery store once to twice per week, prepare meals two to three times per week, clean her house for several hours, do laundry once per week, read, [and] lift ten to fifteen pounds").

Hylton also argues that certain diagnostic images "clearly revealed disabling findings" in 2009, and corroborate Nurse Lange's opinions from 2012. Pl. Br. 15, 17. She does not explain how evidence of mild and minimal degenerative changes—which were also in the record before ALJ Kilbane—corroborate Nurse Lange's work-preclusive restrictions. *See* R. 51–54, 271, 275, 277, 281. She simply disagrees with ALJ Swank's choice between conflicting medical evidence. This Court cannot second-guess that choice were the ALJ gave specific and legitimate reasons, supported by substantial evidence in the record, for discrediting a medical source's opinion. *Bishop*, 583 F. App'x at 67. Given the persuasive evidence discussed above, I find no error with ALJ Swank's decision to reject Nurse Lange's opinions. *Cf. Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *3–4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) ("Plaintiff's medical records conflict with Dr. Trost's opinions, and thus it was the ALJ's role to weigh the evidence to determine which evidence was more persuasive. Unfortunately for Plaintiff, the ALJ sided— fairly and consistently with the law—against Dr. Trost.").

The evidence that supports ALJ Swank's opinion analysis also sustains his RFC determination. ALJ Swank restricted Hylton's ability to sit, stand, walk, lift, reach, climb, kneel, and crawl such that she can perform a limited range of light work. R. 14–15, 16. A person who can lift twenty pounds (and frequently lift and carry ten pounds) can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or

leg controls while sitting." *Hays*, 907 F.2d at 1455 n.1; *accord Lafferty v. Colvin*, 4:13cv49, 2015 WL 156772, at *3 (W.D. Va. Jan. 13, 2015) (Kiser, J.) (citing 20 C.F.R. § 404.1567(b)). Dr. Duckwall found that Hylton could meet these physical requirements based on the evidence before him on October 25, 2011. R. 80–90, 91–101. The sole treatment note produced after that date shows that Hylton's gait, range of motion, and muscle tone were all normal on exam. R. 372 (Dec. 23, 2011).

The ALJ may rely on a non-examining physician's opinion when it is consistent with the record. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). Save for Nurse Lange's opinions—which ALJ Swank reasonably rejected—Hylton does not point to any objective medical or other credible evidence that conflicts with Dr. Duckwall's opinions about her ability to sit, stand, walk, push, pull, or lift up to twenty pounds. *See Carter v. Astrue*, No. 3:10cv510, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011) (noting that the RFC must reflect the limiting effects of those impairments "supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints"), *adopted by* 2011 WL 2693392 (July 11, 2011). Furthermore, substantial evidence supports ALJ Swank's decision not to include Dr. Duckwall's additional postural and manipulative restrictions, as they were inconsistent with examining-source records.

B.      *Hylton's Credibility*

Hylton also argues that substantial evidence does not support ALJ Swank's credibility findings. Pl. Br. 21–22. The regulations set out a two-step process for evaluating a claimant's allegation that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. §§

18

404.1529, 416.929). The ALJ must first determine whether objective medical evidence[9] shows

that the claimant has a medically determinable impairment that could reasonably be expected to

cause the kind and degree of pain alleged. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p,

1996 WL 374186, at *2 (July 2, 1996); *see also Craig*, 76 F.3d at 594–95. If the claimant clears

this threshold, the ALJ then must evaluate the intensity and persistence of the claimant's pain to

determine the extent to which it affects her ability to work. SSR 96-7p, at *2; *see also Craig*, 76

F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which [the

claimant's] statements can be believed and accepted as true." SSR 96-7p, at *2, *4. The ALJ

cannot reject the claimant's description of her symptoms "solely because the available objective

medical evidence does not substantiate" that subjective description. 20 C.F.R. §§ 404.1529(c)(2),

416.929(c)(2); *see also Hines v. Barnhart*, 453 F.3d 559, 563–64 (4th Cir. 2006). Rather, he

must consider "all the available evidence" in the record, including the claimant's statements, her

treatment history, medical-source statements, and objective medical evidence. 20 C.F.R. §§

404.1529(c), 416.929(c).

The ALJ must give specific reasons "grounded in the evidence" for the weight assigned

to a claimant's statements. SSR 96-7p, at *4. A reviewing court will defer to the ALJ's

credibility determination except in "exceptional circumstances." *Bishop*, 583 F. App'x at 68

(citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances

---

[9] Objective medical evidence is "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 404.1529(a); 20 C.F.R. §§ 416.928(b)–(c), 416.929(a). "Symptoms" are the claimant's description of his or her physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a).

19

include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011.

1.     *The ALJ's Findings*

ALJ Swank found that Hylton's musculoskeletal impairments could reasonably be expected to cause her alleged symptoms, but that her statements describing the intensity, persistence, and limiting effects of those symptoms were not credible to the extent that they were inconsistent with an RFC for a limited range of light work. *See* R. 18, 19. He gave four primary reasons for finding Hylton's statements less than fully credible. *See* R. 16–18. First, ALJ Swank found that Hylton's complaints of debilitating pain and functional limitations were inconsistent with the objective medical evidence in her record, including mostly normal physical exams and diagnostic test results. *See* R. 16–17. Second, he found that Hylton's "self-reported activities of daily living [were] inconsistent with an individual who experiences disabling symptoms." R. 17. Third, he found that Hylton's routine and conservative treatment—occasionally visiting a nurse practitioner for non-narcotic medication management—undermined her complaints of debilitating pain. *See* R. 17–18. Finally, ALJ Swank found that none of Hylton's healthcare providers had prescribed an assistive device to help Hylton walk. R. 18.

2.     *Analysis*

ALJ Swank "provided a comprehensive list of reasons," with supporting references to the record, for rejecting Hylton's claim that she cannot work. *See Cooke*, 2014 WL 4567473, at *4 (finding no legal error where the ALJ did the same). Contrary to Hylton's argument, ALJ Swank did not discredit that claim simply "because [Hylton] can occasionally perform limited household chores, count change, and handle a checking/savings account." Pl. Br. 21. ALJ Swank accurately summarized Hylton's statements describing the intensity, persistence, and limiting

effects of her musculoskeletal impairments. *See* R. 15–16; R. 35–36, 208, 229. He also accurately summarized her reports that she cared for herself, occasionally helped feed her sister's dogs and chickens, prepared simple meals every day, "performed household chores including laundry, vacuuming, and washing dishes without help, drove a car, went grocery shopping once a month, read, watched television, and was able to pay bills, count change, and handle a checking/savings account." R. 15, 17; *see also* R. 203–10, 227–29. ALJ Swank "logically reasoned that the ability to engage in such activities [was] inconsistent" with Hylton's testimony that constant debilitating pain severely limits her ability to sit, stand, walk, use her hands, and lift more than ten pounds. *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005).

ALJ Swank's other reasons for discrediting Hylton's statements are also supported by the record. For example, diagnostic images from June and July 2009 show mild and minimal degenerative changes in Hylton's lower back and left leg. R. 271, 275, 277, 281. Between August 2010 and July 2011, Nurse Lange consistently observed that Hylton exhibited a normal gait, intact sensation and reflexes, negative straight-leg tests, full strength in both lower extremities, full strength in her right upper extremity, and full or slightly decreased strength in her left upper extremity. R. 303, 305–06, 309, 311–12, 314, 329, 332. In August 2011, Dr. Cassidy observed "limited motion by about 50% globally in the neck and lower back secondary to pain." *Id.* Hylton's grip was weaker on the left than on the right, but there were no signs of atrophy or joint swelling in any of her extremities. *Id.* Dr. Rubio observed that Hylton's gait, range of motion, and muscle tone were normal on exam in December 2011. R. 371–72. ALJ Swank was not required to accept Hylton's description of her pain to the extent that it was "inconsistent with the available evidence, including objective evidence of the underlying

impairment, and the extent to which that impairment can reasonably be expected to cause [that] pain." *Craig*, 76 F.3d at 595; *accord* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

"An unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition" can also weigh against the claimant's credibility. *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (citing the current 20 C.F.R. § 416.929(c)(3)). Hylton received almost all of her healthcare from Nurse Lange, a family nurse practitioner. Nurse Lange prescribed non-narcotic medication, heat, and exercise to manage Hylton's pain. *See* R. 295, 298–99, 301, 303–04, 306, 309, 312–13, 315, 332. The ALJ noted that Hylton once saw an orthopedic surgeon, who recommended physical therapy and continued use of non-narcotic medication over surgery. *See* R. 16, 325–26. Hylton apparently sought no healthcare at all for several months during the relevant period. *See* R. 24. These unexplained inconsistencies undermine Hylton's testimony that she suffers constant, debilitating musculoskeletal pain and weakness. *See Mickles*, 29 F.3d at 930; *Mabe v. Colvin*, 4:12cv52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013) (Kiser, J.).

Finally, the ALJ correctly found that none of Hylton's providers had prescribed an assistive device to help her walk. *See* R. 18. Information that a treating or examining source provides about a claimant's symptoms is an important indicator of the intensity, persistence, and limiting effects of symptoms, such as pain, that can be difficult to quantify. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Thus, a provider's failure to impose "symptom-related functional limitations and restrictions," *id.*, can weigh against the claimant's credibility. 20 C.F.R. §§ 404.1529(c)(3)(vii), 416.929(c)(3)(vii); *Hicks v. Colvin*, No. 7:12cv618, 2014 WL 670916, at *6 (W.D. Va. Feb. 20, 2014) ("Finally—and significantly—the ALJ noted that the claimant's allegations of totally disabling symptoms were unsupported by any restriction placed on her by

22

her treating physicians."). None of Hylton's healthcare providers questioned, let alone restricted, her physical activity during the relevant period. On the contrary, Nurse Lange encouraged Hylton to exercise "as tolerate[d]" even when she reported chronic joint pain and weakness. *See* R. 295, 298, 301. ALJ Swank's evaluation of Hylton's credibility is reasonable, consistent with other findings, and fully supported by the record.

C.      *Hylton's Ability to Work*

Finally, Hylton argues that ALJ Swank should have called a VE to testify about her ability to work because ALJ Swank found severe medical impairments that ALJ Kilbane did not. *See* Pl. Br. 19–21. At step four, the claimant bears the burden of persuading the Commissioner that she cannot perform her past relevant work "either as [she] actually performed it" or as it is "generally performed in the national economy." *Goodman v. Astrue*, 539 F. Supp. 2d 849, 850 (W.D. Va. 2008) (citing 20 C.F.R. §§ 416.920(f), 416.960(b)). The ALJ may rely on VE testimony when determining whether the claimant can return to her past relevant work. *Bottoms v. Colvin*, No. 4:12cv48, 2013 WL 5533708, at *4 (W.D. Va. Oct. 7, 2013).

On February 17, 2010, ALJ Kilbane found that Hylton could perform light work as defined in the regulations, except that she could not perform "repetitive gripping, grasping, pushing, pulling, or overhead work with the left upper extremity"; could occasionally climb and kneel, but never crawl; and must avoid heights and hazards. R. 50. He also found that Hylton had past relevant work as a furniture factory utility person, retail manager, nanny, shipping worker, textile mill inspector, weaver, and store clerk. R. 55. ALJ Kilbane noted that the VE who testified at Hylton's hearing classified each of these jobs as "light" work, and testified that the RFC "defined above" allowed Hylton to "perform her past work as a retail manager, nanny, and

23

store clerk." *Id.* ALJ Kilbane concluded that Hylton was not disabled because she could perform these three jobs as actually and generally preformed. *Id.*

On August 13, 2012, ALJ Swank found that Hylton had the same past relevant work and "same exact" RFC. R. 19. He noted that the VE who testified at Hylton's first hearing classified her past jobs as "light" work and testified that the RFC defined in ALJ Kilbane's decision allowed Hylton to "perform her past work as a retail manager, nanny, and store clerk." *Id.* Hylton does not challenge ALJ Kilbane's assessment of her past relevant work or ALJ Swank's reliance on those prior findings. *See* Pl. Br. 19–21.

Instead, Hylton argues that ALJ Kilbane's hypothetical was inadequate for her disability claim that is now before this Court because ALJ Swank found additional severe medical impairments. *See id.* She also argues that ALJ Kilbane's decision does not indicate whether his hypothetical included "limitations of occasional reaching in front and laterally or the limitations of only occasionally crouching and stooping that were found by the state agency physicians in [this] case."[10] *Id.* These arguments, which essentially rehash Hylton's disagreement with ALJ Swank's RFC determination, are without merit.

First, ALJ Swank did not need to ask about stooping, crouching, and lateral reaching because he reasonably decided not to include those restrictions in Hylton's RFC. *See Fisher*, 181 F. App'x at 365 ("Because the ALJ's [RFC] determination is supported by substantial evidence and because the challenged hypothetical question merely incorporated that determination, the ALJ committed no error.").

_____

[10] These arguments necessarily assume that ALJ Swank's RFC is not supported by substantial evidence. *See* Pl. Br. 19–21. At oral argument, Hylton's attorney agreed with the Court's interpretation of her arguments, and conceded that the Court should affirm the Commissioner's final decision if it finds that ALJ Swank's RFC determination is supported by substantial evidence in the record.

Second, ALJs have some discretion when communicating to a VE "what the claimant can and cannot do. Moreover, it is the claimant's functional capacity, not [her] clinical impairments, that the ALJ must relate" through his questions. *Id.*; *accord* 20 C.F.R. §§ 404.1560(b), 416.960(b) (explaining that the agency may use VE testimony to determine whether the claimant can do her past relevant work "given [her] residual functional capacity"). Other than assailing ALJ Swank's RFC determination, Hylton does not challenge his step four finding that she can perform her past work. ALJ Swank concluded that Hylton was not disabled because she could perform her past relevant work as actually and generally performed, given her RFC. R. 19. Because, as explained above, I find that Hylton's RFC is supported by substantial evidence, I reject her challenge to the ALJ's finding that she can perform her past work.

## V. Conclusion

This Court must affirm the Commissioner's final decision that Hylton is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, I recommend that the Court **DENY** Hylton's motion for summary judgment, ECF No. 16, **GRANT** the Commissioner's motion for summary judgment, ECF No. 20, and **DISMISS** this case from the docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 9, 2015

Joel C. Hoppe
United States Magistrate Judge